OPINION
{¶ 1} Defendant-appellant, Steven K. Wilson, appeals his conviction in the Butler County Court of Common Pleas for murder. We affirm the decision of the trial court.
 {¶ 2} On June 24, 2001, appellant's wife, Bambi Wilson, allegedly told appellant that there was no hope of reviving their marriage and that she wanted a divorce. According to appellant, he informed Bambi that he was going to commit suicide, but she did not believe him and she turned away. Appellant claims that he obtained a revolver and as he was bringing it out of his pocket to shoot himself, it accidentally went off and Bambi was struck in the head.
 {¶ 3} At approximately 7:00 a.m. on June 24, 2001, appellant called 9-1-1 to report that he had just shot his wife at their house in Trenton, Ohio. Trenton police officers arrived at the scene of the shooting minutes later to find appellant walking out the door of the house with a cordless phone in his hand. Appellant told the officers that he shot his wife in the head and then he asked the officers to help her.
 {¶ 4} Appellant was secured in the police cruiser. The officers then entered the house to find Bambi lying on the couch with a pillow under her head and a sheet pulled up to her shoulders. The officers noticed a small wound in Bambi's right eyelid and observed blood coming from the wound, her mouth, and both ears. The officers found a faint pulse, and emergency medical personnel soon arrived and attempted cardiopulmonary resuscitation ("CPR"). After several minutes of CPR, the emergency medical personnel called the Middletown Regional Hospital for permission to discontinue CPR due to the extent of her injuries. Permission was granted and CPR was discontinued.
 {¶ 5} The coroner's office performed an autopsy. Pathologist Dr. C. Norman Hurwitz determined Bambi's cause of death was an injury to the brain, secondary to a small-caliber gunshot wound. Based on the trajectory of the bullet through Bambi's brain, Dr. Hurwitz stated that it appeared she was shot "from above." Dr. Hurwitz also stated that the lack of stippling or burning around the entry wound would suggest that the gun was fired from a distance of more than three feet from the wound.
 {¶ 6} The officers recovered a single-action .22 caliber Ruger six-shot revolver from the island counter in the kitchen. The revolver was found with five live rounds and a single spent cartridge casing in the cylinder.
 {¶ 7} Appellant was tried by a jury. The jury returned its verdict on January 31, 2002, finding appellant guilty of murder with a firearm specification. The trial court sentenced appellant to a term of 15 years to life in prison for the murder and an additional three-year term for the firearm specification. Appellant appeals the conviction raising three assignments of error:
Assignment of Error No. 1:
 {¶ 8} "DEFENDANT-APPELLANT'S CONVICTION OF MURDER WAS AGAINST THE MANIFEST WEIGHT OT THE EVIDENCE."
 {¶ 9} When reviewing a claim that the judgment in a criminal case is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See State v. Thompkins (1997), 78 Ohio St.3d 380, 387, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." Id. In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
 {¶ 10} Appellant argues that a "jury loses its way and erroneously convicts a defendant of murder when there is no evidence that he purposely killed another, and all the circumstances show that the killing was accidental."
 {¶ 11} The record shows that Bambi wanted to divorce appellant. A neighbor of the Wilsons, Amy Hobbs, testified that she spoke with both appellant and Bambi regarding their troubled marriage. Furthermore, according to Hobbs, Bambi asked her to watch the Wilsons' twin daughters the night before the homicide so Bambi could go out with a man other than her husband. Appellant also testified that Bambi had been seeing other men, and that appellant and Bambi no longer had a sexual relationship. Furthermore, Hobbs testified that Bambi stated she and appellant were sleeping in separate rooms because appellant was sexually abusing Bambi while she was sleeping.
 {¶ 12} Appellant testified that he asked Bambi if she would go to church with him to work on their marriage the morning of the homicide. Bambi stated the marriage was beyond repair and she refused to go to church with appellant. According to appellant, he then stated he was going to kill himself. Appellant testified that Bambi ignored his warning. According to appellant, he retrieved a revolver, he cocked the hammer, and while attempting to commit suicide his hands were shaking and he accidentally fired a .22 caliber round that lodged a bullet in Bambi's brain.
 {¶ 13} The .22 caliber Ruger single-action six-shot revolver recovered by the officers requires the hammer to be cocked, before the firing of each round. Pulling the trigger alone, without cocking the hammer, will not fire the revolver. Larry Dehus, a forensic scientist, testified that in his opinion the .22 caliber Ruger revolver "could not accidentally discharge without someone pulling the trigger."
 {¶ 14} Based on the trajectory of the bullet through Bambi's head and a photograph of Bambi at the scene, Dr. Hurwitz determined that Bambi was shot from above. Dr. Hurwitz also stated that the lack of stippling or burning around the entry wound would suggest that the gun was fired from a distance of more than three feet from the wound.
 {¶ 15} According to appellant, once he realized his wife Bambi was shot, he proceeded to remove "the pillow out from under her head" and perform CPR in an attempt to save her life. He then called 9-1-1. However, Trenton Police Officer Mike Matala testified to Bambi's position when he arrived at the scene of the shooting. Officer Matala testified that Bambi "was laying [sic] on the couch, * * * she was facing the television. The television was on. * * * The sheets were pulled up to shoulder level, there appeared to have not been any disturbance. She appeared to be, like I said, sleeping * * *. She was laying [sic] * * * kind of at a 45-degree angle, head facing the television, and her head was comfortably — appeared to be comfortably resting on a pillow."
 {¶ 16} Furthermore, when appellant called 9-1-1, the operator asked appellant, "why did you shot [sic] your wife?" Appellant replied, "she was leaving me." The 9-1-1 operator reiterated, "she what?" And appellant again answered, "she was leaving me." However, later in the conversation appellant states, "I was shoot'n [sic] accidental."
 {¶ 17} Ronald Siler testified that he met appellant once. Siler's roommate brought appellant to their apartment one night when they were drinking. According to Siler, appellant began discussing his wife while they were drinking. According to Siler, appellant stated that he was "going to kill the fucking bitch." However, appellant denies having made the statement.
 {¶ 18} After reviewing the evidence in the record, we find there is credible evidence to support the finding that appellant purposely killed his wife, Bambi. The jury did not clearly lose its way and create a manifest miscarriage of justice. Therefore, the first assignment of error is overruled.
Assignment of Error No. 2:
 {¶ 19} "THERE WAS INSUFFICIENT EVIDENCE TO JUSTIFY A VERDICT OF MURDER."
 {¶ 20} In determining whether a conviction is supported by sufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 21} Appellant argues when "the state fails to produce sufficient evidence providing all the elements of a crime, a defendant's conviction must be reversed." Murder is defined as purposefully causing the death of another. See R.C. 2903.02(A). Appellant argues the evidence was insufficient to prove a purposeful killing.
 {¶ 22} The record demonstrates that appellant and Bambi were having an argument in their Trenton house about their marriage. Appellant testified that Bambi was seeing other men. Amy Hobbs testified that Bambi confessed she wanted to divorce appellant and that she was seeing other men. Appellant testified he and Bambi were sleeping in separate rooms and no longer had a sexual relationship. Hobbs testified that Bambi told her she and appellant slept in separate rooms because appellant would sexually assault Bambi when she was sleeping.
 {¶ 23} Appellant stated he asked Bambi on June 24, 2001, if she would go to church with him to work on their marriage. Bambi stated the marriage was beyond repair and she refused to go to church with appellant. Appellant stated he was going to kill himself and appellant testified that Bambi ignored his threat. Appellant obtained a revolver, he cocked the hammer, and fired the revolver. Appellant admits that the bullet that killed Bambi came from the .22 caliber Ruger revolver he fired. However, appellant claims that he accidentally shot Bambi because his hands were shaking when he was attempting to commit suicide.
 {¶ 24} Yet, forensic scientist, Larry Dehus, testified that, in his opinion, once the .22 caliber Ruger revolver was cocked, it "could not accidentally discharge without someone pulling the trigger." Ronald Siler also testified that appellant stated he was "going to kill the fucking bitch." The pathologist determined that the trajectory of the gunshot wound that killed Bambi came "from above." Furthermore, when the 9-1-1 operator asked appellant, "why did you shot [sic] your wife," appellant replied, "she was leaving me."
 {¶ 25} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Therefore, the evidence was sufficient to support a verdict of guilty on the murder charge. The second assignment of error is overruled.
Assignment of Error No. 3:
 {¶ 26} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT PERMITTED THE TESTIMONY OF ROBERT SILER."
 {¶ 27} Appellant argues that "when the late disclosure of a witness is prejudicial to the defense, it is incumbent upon the court to exclude that witness's testimony."
 {¶ 28} Crim.R. 16(B)(1)(e) requires the prosecutor to "furnish to the defendant a written list of the names and addresses of all witnesses whom the prosecuting attorney intends to call at trial." The duty to disclose information is a continuing one, so that a party must notify the other party as new discoverable information is gained. See Crim.R. 16(D).
 {¶ 29} If the state fails to promptly provide the identity of a witness as required by Crim.R. 16, the trial court does not abuse its discretion by permitting the witness to testify if it can be shown that: (1) the state's failure to provide discovery was not willful, (2) foreknowledge of the statement would not have benefited the defendant in preparation of his defense, and (3) the defendant was not prejudiced by the admission of the evidence. State v. Czajka (1995), 101 Ohio App.3d 564,572. Where the failure to disclose a witness is not willful, the trial court has numerous means to cure such a deficiency in discovery. SeeState v. Wamsley (1991), 71 Ohio App.3d 607, 610. One remedy available to the trial court is giving defense counsel the opportunity to interview the witness prior to the witness testifying. State v. Heinish (1990),50 Ohio St.3d 231, 236.
 {¶ 30} The state first learned of Robert Siler on the Friday before the trial began on Monday, January 28, 2002. The state informed appellant's trial counsel of Siler's name and address immediately. An investigator interviewed Siler that day on behalf of appellant. On the first day of trial, the court ordered the prosecution to produce Siler and allowed appellant's trial counsel to interview Siler. Siler was interviewed and the following day appellant's trial counsel cross-examined Siler.
 {¶ 31} It is clear from the record that appellant knew of Siler, as well as the substance of his testimony. The state supplied Siler's name before trial, in compliance with Crim.R. 16(D). In addition, the trial court took the appropriate steps to cure any prejudice appellant may have suffered, allowing defense counsel to interview the witness and the time necessary to prepare a cross-examination. Therefore, we find that under the circumstances, the trial court's decision to permit the testimony of Siler was not unreasonable, arbitrary, or unconscionable. See Wamsley, 71 Ohio App.3d at 610. Therefore, the third assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and YOUNG, J., concur.